**IN THE U.S. DISTRICT COURT FOR THE DISTRICT OF MARYLAND**
[Greenbelt (Southern) Division]

---

**Greg Boettcher**
46 Darlene Avenue
Linthicum, Maryland 21090
County of Anne Arundel
       Plaintiff.

*vs.*

**SSC Glen Burnie Operating
Company, LLC**
c/o The Corporation Trust Company
1209 Orange Street
Wilmington, DE  19801

**SAVASENIORCARE, LLC**
1 Ravinia Drive
Atlanta, GA 30346
       Defendants.

FILE NO.: 1-15-cv-3714

*HONORABLE*

**JURY TRIAL DEMANDED**

DAN R. MASTROMARCO
Attorney for Plaintiff
Maryland Bar ID:  18243
THE MASTROMARCO FIRM, PLLP
703 GIDDINGS AVENUE, U6
(410) 349-1725 (T)
(410) 268-1597 (F)
argusgroupdrm@aol.com
_____/

Notice:  There is no other pending or resolved civil action
arising out of the same transaction or
occurrence in this Complaint.

**COMPLAINT, DEMAND FOR JURY TRIAL
& DEMAND FOR PRE-TRIAL CONFERENCE**

NOW COMES the above-entitled Plaintiff, GREG BOETTCHER (hereafter "Plaintiff" or "Mr. Boettcher"), by and through his attorney, DAN R. MASTROMARCO, and hereby complains against the Employer, SSC GLEN BURNIE OPERATING COMPANY, LLC (doing business as the "Glen Burnie Health and Rehabilitation Center" (hereafter "SSC Glen Burnie") and SAVASENIORCARE, LLC (hereafter "SavaSeniorCare") (collectively referred to herein as "Employer" or "Defendants").  For his causes of action, Mr. Boettcher avers:

## I.  INTRODUCTION AND OVERVIEW

1.      Mr. Boettcher files this action to recover damages he has sustained when his Employer's managers, employees, servant(s)' and/or agent(s)' (a) wrongfully terminating his employment with SSC Glen Burnie, and (b) failed to pay him just compensation under the Fair Labor Standards Act of 1938 (FLSA) as amended, 29 U.S.C. 201, *et seq*.

2.      SavaSeniorCare and/or SSC Glen Burnie hired Mr. Boettcher on December 10th, 2010.

3.      SavaSeniorCare and/or SSC Glen Burnie terminated Mr. Boettcher on November 25, 2014.

4.      The managers, employees, servants and/or agents of SavaSeniorCare and/or SSC Glen Burnie, and by the extension the entities on whose behalf they acted, wrongfully discharged Mr. Boettcher when they did so in retaliation for, *inter alia,* (a) Mr. Boettcher's complaints of harassment against SavaSeniorCare's Regional Vice President for Operations (RVPO), Mr. David Stratmeyer, (b) Mr. Boettcher's refusal to accede to requests by his superior Mr. Calvin Vain to exercise undue and improper influence over the offices of the Maryland Fire Marshall to reduce or remove various violations for which that agency had cited SSC Glen Burnie during a routine inspection of the premise, (c) Mr. Boettcher's filing of criminal complaint against Mr. Vain, and (d) Mr. Boettcher's actions to vindicate his rights under the FLSA (Counts I and II).

5.     The managers, employees, servants and/or agents of SavaSeniorCare and/or SSC Glen Burnie, and by extension the entities on whose behalf they acted, also violated the recordkeeping and overtime requirements of the FLSA and the Wage and Hour and Recordkeeping Requirements under Maryland (Maryland Labor and Employment Code Article 3) when they knowingly misclassified Mr. Boettcher as an exempt employee, required Mr. Boettcher to work more than a 40 hour workweek without just compensation, and required that he ensure timesheets falsely showed that he was under the 40 hour per week threshold in order to avoid their duties under federal and state law (Counts III and IV).

## II.  JURISDICTION AND VENUE

6.     This Court has original jurisdiction under 28 U. S. C. §§1331 as this civil action arises under the Constitution, laws, or treaties of the United States to recover damages under FLSA (29 U. S. C. §216(b)), which provides *inter alia* that "[a]n action to recover [damages] ... may be maintained ... in any Federal or State court of competent jurisdiction," 29 U. S. C. §216(b).

7.     This action arises in part from cognizable injuries Mr. Boettcher sustained under the FLSA; including damages for unpaid wages, liquidated damages, prejudgment interest, and attorney's fees.

8.     This Court has additional jurisdiction under 28 U. S. C. §1332 because it constitutes a civil action where the matter in controversy exceeds the sum or value of $75,000 between citizens of different States.  SSC Glen Burnie is formed under the laws of Delaware, and on information and belief, although assets and employees are located in Maryland, the entity's principal place of business is in Georgia, the "nerve center" from where the managers of the LLC conduct the entity's important business.

9.     This Court has supplemental jurisdiction to hear ancillary claims under Title 28 U.S.C. § 1367 so related to the federal law claims that they form part of the same case or controversy.  The wrongful discharge claims form part of the same case or controversy as the claims brought under the FLSA.

10.     This Court may properly maintain personal jurisdiction over Defendants: their contacts with this state and judicial district sufficiently comply with traditional notions of fair play and substantial justice.

11.     Venue is proper in the District Court of Maryland under 28 U.S.C. §1391(b) because a substantial part of the events or omissions giving rise to the claim occurred in Maryland, where defendants are subject to the Court's personal jurisdiction.

### III.     COMMON FACTS:
### A.     THE PARTIES

**SavaSeniorCare (Defendant)**

6.     Upon information and belief, SavaSeniorCare is a privately owned entity organized under the laws of Delaware.

7.     SavaSeniorCare -- with a principal place of business at One Ravinia Drive, Suite 1500, Atlanta GA 30346 -- describes itself as one of the largest providers of short- and long-term health care in the United States.

8.     SavaSeniorCare functions through a network of local nursing and assisted living facilities, holding itself out as the operational and managerial overseer of such facilities.

9.     During the most recent fiscal year, SavaSeniorCare employed approximately 25,000 individuals nationwide at more than 100 such facilities, generating revenues of approximately $1.27 billion.

10.     Indeed, the regional and corporate managers of SavaSeniorCare exercise authority over the various local facilities.

11.     This authority (which the regional and corporate managers of SavaSeniorCare exercise over their local centers) includes the power to hire and fire employees and managers of those local centers.

12.     SavaSeniorCare exercised the authority over SSC Glen Burnie to hire and fire employees of that facility.

13.     Upon information and belief, SavaSeniorCare exercises its authority over the local centers through a network of Regional Vice Presidents and supervisors, who have implied, apparent or express authority to bind both the centers and their parent entit(y/ies), to set policy and to hire and fire employees.

14.     Upon information and belief, SavaSeniorCare, individually or collectively, owns wholly or in majority part the various facilities it manages and oversees.

15.     Upon information and belief, SavaSeniorCare wholly or in majority part owns the LLC Membership Units of SSC Glen Burnie.

16.     Upon information and belief, SavaSeniorCare is indeed so sufficiency integrated and interrelated with SSC Glen Burnie, through common operations, ownership or management, centralized control of labor relations, and other factors, that the two Defendants may be treated as a single and/or joint employer for purposes of the instant action.

**SSC Glenn Burnie (Defendant)**

17.     SSC Glen Burnie is a Delaware Limited Liability Company, organized under the Statutes of Delaware, Title 6, Subtitle II, Chapter 18 (the Limited Liability Company Act) since July 28th, 2004.

18.     SSC Glen Burnie conducts substantially all of its business, owns assets and is physically located at 7355 E Furnace Branch Rd, Glen Burnie, MD 21060.

19.     SSC Glen Burnie is one of ten affiliated "Health and Rehabilitation" Center facilities that SavaSeniorCare operates and owns in Maryland.

20.     At all times relevant hereto, SavaSeniorCare oversaw the management of SSC Glen Burnie, set wage policy, and approved of both the hiring and firing of employees.

21.     Other facilities SavaSeniorCare operates in Maryland include the Overlea Health and Rehabilitation Center (legally named, the SSC Baltimore Operating Company LLC)(hereafter "Overlea"), which is located at 6116 Belair Road, Baltimore, MD 21206 and the Summit Park Health and Rehabilitation Center (legally named, the SSC Catonsville Operating Company LLC)(hereafter referred to as "Summit Park"), which is located at 1502 Frederick Road, Catonsville, MD 21228.

22.     At times relevant hereto, Mr. Calvin Vain functioned as the Administrator of the SSC Glen Burnie facility, and Mr. Boettcher's supervisor, and in that capacity had the power and authority to fire Mr. Boettcher.

23.     At times relevant hereto, Mr. David Stratmeyer functioned as the RVPO, as Mr. Calvin Vain's superior, and in that capacity, had the power and authority to fire Mr. Boettcher.

**Gregg Boettcher (Plaintiff)**

24.     Mr. Boettcher resides in the State of Maryland, at 46 Darlene Avenue, Linthicum, Maryland 21090, within the County of Anne Arundel.

25.     At all times relevant hereto, Mr. Boettcher was an employee of SavaSeniorCare and/or SSC Glen Burnie.

26.     At all times relevant hereto, Mr. Boettcher served as Supervisor of Maintenance at the SSC Glen Burnie.

## B.     CHRONOLOGY OF THE CONTROVERSY

*Mr. Boettcher's Employment within the Industry.—*

23.     Mr. Boettcher has had a long and (until the events giving rise to this suit) successful career of working for long term health care facilities, having worked more than 20 years in the industry.

24.     Indeed, much of this employment was with affiliates of SavaSeniorCare and predecessor entities, which predated his engagement with SSC Glen Burnie and his employment under the supervision of Messrs. Vain and Stratmeyer.

25.     Throughout this time, Mr. Boettcher was employed in the field of maintenance.

26.     In this capacity, Mr. Boettcher performed general maintenance and/or effected minor repairs to health department buildings and grounds, and did related tasks as required to keep those grounds in good repair.

27.     As part of his responsibilities, for example, Mr. Boettcher saw to it that the various facilities had adequate heating, lighting, and ventilation, and were properly cleaned and in good working condition.

28.     Mr. Boettcher also made minor repairs to and inspections of equipment, performed general repair work, such as painting, patching walls, hanging shelves, and landscaping, operated machinery and equipment, arranged desks, files, and other office equipment and performed janitorial duties and other related tasks as required.

29.     In greater detail, Mr. Boettcher began his career in the senior care industry in 1990, when, from that date until the year 2,000, he worked for Genesis Eldercare in Randallstown, Maryland, as "maintenance director."

30.     Like a SavaSeniorCare facility, Genesis Healthcare offered short stay and long term care.

31.     In the year 2000, Mr. Boettcher left his position at Genesis Healthcare to work for Mariner Postacute, another health care facilities located in Catonsville, Maryland, where he was similarly engaged in maintenance services

32.     In 2004, on information and belief, SavaSeniorCare purchased Mariner Postacute.

33.     Shortly thereafter, the name of the facility was changed to SSC Catonsville Operating Company

LLC (again, "Summit Park").

34.     Following SavaSeniorCare's purchase of Mariner Postacute, Mr. Boettcher continued working for the Summit Park, this time in the capacity of "Environmental Director."

35.     As Environmental Director at Summit Park, Mr. Boettcher performed essentially the same maintenance services he performed at Mariner Postacute, and before that Genesis Eldercare.

36.     The Housekeeping and Laundry departments of Summit Park were outsourced in 2003.

37.     Mr. Boettcher continued in the capacity of Maintenance Director with Summit Park until he left on his own accord to pursue a personal business venture in October of 2007.

38.     Following his departure, Mr. Boettcher owned and operated his own small business, until December 10th, 2010, when he chose to return to SavaSeniorCare.

39.     As a seasoned and trusted employee, upon his return, SavaSeniorCare afforded Mr. Boettcher a choice: he could elect to work for either the Summit Park or SSC Glen Burnie facility.  Mr. Boettcher chose to work for the SSC Glen Burnie facility for the challenge of working in a multi-building environment.

40.     At SSC Glen Burnie, Mr. Boettcher reassumed a position in maintenance, where he remained until his termination on November 25th, 2014.

**Review History.—**

41.     Throughout the many years Mr. Boettcher worked in maintenance – first at Genesis Eldercare, then Mariner Postacute (which became Summit Park) and finally the SSC Glen Burnie, -- Mr. Boettcher enjoyed many favorable reviews, accolades when evaluated for his performance.

42.     At Summit Park, for example, Mr. Bud Boyce, Mrs. Karen Jenkins and Ms. Jaquelin Hardy, the directors of that facility, rated Mr. Boettcher's performance as "excellent," a rating that constituted the

most complimentary performance review awardable, well beyond satisfactory.

43.     It was on the strength of these favorable reviews that Mr. Boettcher was welcomed back to SavaSeniorCare following his stint at self-employment.

44.     Upon his return to SavaSeniorCare, from December 2010 to June of 2011, Mr. Boettcher continued to receive excellent reviews, 5 out of 5.

45.     While no employees were given reviews during the period from 2011 to May 2013, consistent with his past performance, Mr. Boettcher continued to earn high praise for his efforts and competence.

46.     Indeed, Mr. Boettcher functioned with such distinction in his role at the SSC Glen Burnie that his supervisor provided him with personal accolades and entrusted him with additional work.

47.     Around June of 2013, Mr. John Spadaro, who then functioned as the RVPO of SavaSeniorCare, asked Mr. Boettcher to fill demand created when an employee, Thomas Sova, left Overlea.

48.     Mr. Boettcher agreed to do so, performing this double-duty so admirably, that Mr. Spadaro recognized him for his notable services.

49.     Indeed, Mr. Spadaro awarded Mr. Boettcher a $2,000 bonus in order to express his expression for Mr. Boettcher's help at Overlea and Summit Park beyond the call of duty, particularly during an emergency electrical outage resulting from a hurricane that could have had serious ramifications for the health and safety of the residents.

50.     So, again, through the entire period that Mr. Boettcher worked in maintenance, either for Sava Senior Care or for facilities owned by its predecessor, he received consistently positive and favorable reviews.

*The Advent of Animosity towards Mr. Boettcher.—*

51.     As events would have it, Mr. Boettcher's favorable tenure at SavaSeniorCare was about to

change, and through a sequence of unfortunate events set in motion by a disgruntled SavaSeniorCare manager working in concert to undermine his employment and reputation.

52.     Although Mr. Spadaro informed Mr. Boettcher that the double-duty Mr. Boettcher had been asked to perform at Overlea was to fill the demand created by a Mr. Sova's departure, what Mr. Spadaro neglected to inform Mr. Boettcher, and what Mr. Boettcher did not otherwise know, was that Mr. Sova's departure followed Mr. Spadaro's decision to terminate Mr. Sova for cause.

53.     More importantly, the fired Mr. Sova, whose job Mr. Boettcher was asked to fill, happened to be the brother-in-law of David Stratmeyer, who was soon to become the incoming RVPO who would replace Mr. Spadaro.

54.     As previously noted, the RVPO, Mr. Stratmeyer functioned as Mr. Boettcher's superior, and had the power not only to fire Mr. Boettcher but Mr. Boettcher's immediate boss, the Administrator of SSC Glen Burnie.

55.     More troublesome yet, as events would have it, Mr. Boettcher's dual role for SSC Glen Burnie and Overlea facilities ceased when in the month of February 2014, Mr. Albert Meeks (an employee who worked with Mr. Boettcher)(and who also happened to be Mr. Boettcher's father-in-law), assumed the role formerly held by Mr. Stratmeyer's brother-in-law, Mr. Sova.  In summary, Mr. Stratmeyer saw that Mr. Boettcher's father-in-law replaced Mr. Stratmeyer's brother-in-law).

56.     When Mr. David Stratmeyer, Mr. Sova's brother-in-law, took over as the new RVPO in October of 2013, he carried with him a deep animosity towards Mr. Boettcher, whom he blamed for the departure of his brother-in-law, Mr. Sova.

57.     And what then unfolded over the course of several months were various actions orchestrated and executed by Mr. Stratmeyer to retaliate against Mr. Boettcher.

58.    Mr. Stratmeyer began his vendetta by terminating Mr. Meeks, with whom he had a demonstrably contentious relationship.

59.    And then, turning his animus towards Mr. Boettcher, despite his favorable work performance, Mr. Stratmeyer instituted a campaign of intimidation and harassment.

60.    Mr. Stratmeyer began his campaign immediately upon his assumption of a position of RVPO.

61.    The first such incident occurred on or about May 13th, 2014, when Mr. Stratmeyer took the unusual step of nano-management, interceding in the routine management of SSC Glen Burnie in order to target Mr. Boettcher.

62.    It was on or about that date that Mr. Stratmeyer urged a reluctant SSC Glen Burnie Administrator Holly Norelli to reprimand Mr. Boettcher in writing on bogus charge.

63.    In particular, Mr. Stratmeyer demanded that Ms. Norelli "write up" Mr. Boettcher for not timely completing a countertop project on nursing stations.

64.    Ms. Norelli, who was Mr. Boettcher's direct report, had reviewed Mr. Boettcher's performance once in 2011, and at that time, had given him excellent reviews.  Indeed, she had no complaints against Mr. Boettcher's performance, and did not agree that the write up of Mr. Boettcher was deserved or appropriate.

65.    Known to Mr. Stratmeyer, the charge leveled against Mr. Boettcher was false; in fact, through that charge Mr. Stratmeyer merely sought to punish Mr. Boettcher for the firing of Mr. Sova, by building a record of false accusations that would impugn his reputation within the company.

66.    Mr. Stratmeyer's insistence that Ms. Norelli "write Mr. Boettcher up" was unrelated to Mr. Boettcher's work performance or competence, but rather designed entirely to settle old grudges as a thinly veiled attempt to set up a termination.

67.     In fact, the basis of the charge was effectively seeking to hold Mr. Boettcher responsible for not overcoming an obstacle Mr. Stratmeyer had purposely imposed in his path.  Mr. Boettcher had in fact fulfilled all the steps required of him to timely effect these repairs by properly submitting a capital request form for the cost of requisite materials.

68.     Mr. Stratmeyer, however, who was required to sign that capital request form in order to initiate the process, purposely chose not to do so.

69.     Ms. Norelli at first protested Mr. Stratmeyer's importunes to rebuke Mr. Boettcher, and on the day she was requested to write him up, she in fact refused to follow her supervisor's directive to do what she considered to be grossly unfair.

70.     It wasn't until the next morning that Ms. Norelli did write it up Mr. Boettcher, begrudgingly, in Mr. Boettcher's presence, as the two of them struggled together to wordsmith the write-up that might satisfy Mr. Stratmeyer's unfounded demands.

71.     When Ms. Norelli, with reservation, filed the write up on or about May 12th, 2014, Mr. Boettcher responded by calling the corporate compliance line, in order to file his own Complaint of harassment against Mr. Stratmeyer pursuant to the Employment Handbook.

72.     Despite filing this formal Complaint in compliance with and consistent with the Employment Handbook (Ex. 1) and Code of Conduct (Ex. 2), Mr. Boettcher heard nothing further as a consequence of the Complaint until two months later.

73.     It was in July of 2014, tht Mr. Boettcher had occasion to meet with Stephanie Jones, Regional head of Human Resources bout the Complaint.  But when Mr. Boettcher inquired about the status of his Complaint, the Human Resource Department informed him that the reprimand against him – initiated by

Mr. Stratmeyer – had been quashed as baseless, without opining about Mr. Boettcher's reciprocal

Complaint

74.     Mr. Stratmeyer did not stop at his failed attempt to discredit Mr. Boettcher.  Rather, Mr.

Stratmeyer sought to continue his harassment campaign through the instrument of a new, hand-selected

Administrator of SSC Glen Burnie, Calvin Vain.

75.     When in August or September of 2014, Mr. Calvin Vain became the Administrator of SSC Glen

Burnie Center, on his first day, out of 200 employees within the facility, he chose to single out Mr.

Boettcher to speak with.

76.     During this initial discussion, Mr. Vain spoke to Mr. Boettcher on a highly personal level,

disclosing facts that showed Mr. Vain had an unusual degree of background connecting Messrs.

Stratmeyer and Boettcher.  Tellingly, Mr. Vain made a point of mentioning Mr. Boettcher's father-in-

law's, Mr. Meeks, and the fact of his termination from Overlea.

77.     On or about September of 2014, Mr. Vain, acting on behalf of Mr. Stratmeyer, began to greatly

step up efforts to discredit Mr. Boettcher, hatching a plan to take away any discretion Mr. Boettcher had

to prioritize his work or perform the various functions on the timing of his choosing.

78.     In particular, in an effort to build a record against Mr. Boettcher, Mr. Vain demanded Mr.

Boettcher provide target dates for repairs to various listed items, even though Mr. Boettcher informed

him it was impossible to accurately predict how long a particular repair would take.

79.     At the time, Mr. Vain not only knew the difficulty of projecting completion dates, but he knew

that Mr. Boettcher had other duties, which if ratcheted up, would frustrate Mr. Boettcher's ability to

honor those completion times within a 40 hour work week.

80.     When Mr. Boettcher expressed to Mr. Vain his concern that his demands for previse dates and times for completion appeared to be his way of building a record for anticipatory termination, Mr. Vain retorted defensively, "no, it's for your benefit to show Mr. Stratmeyer."

81.     Each week, under this new regime of micromanagement by the Administrator of the facility, Mr. Boettcher would perform the punch list tasks demanded by Mr. Vain, and each week he would provide the report on his progress on this punch list to Mr. Vain.

82.     Each week thereafter, however, Mr. Vain would present an even more detailed punch list with increasingly tighter time frames, hoping that Mr. Boettcher was incapable of physically meeting the deadlines.

83.     In this manner, Mr. Vain, sought to increase the burden upon Mr. Boettcher until he could no longer fulfill these functions within the requisite time frame as a pretext for firing him.

84.     Throughout this time, Mr. Vain was acting at the behest of Mr. Stratmeyer, as punishment for replacing his father-in-law at Overlea.

85.     Mr. Vain's campaign of harassment escalated further, and soon extended to asking Mr. Boettcher to perform tasks that were not just unsavory, but patently unlawful.

86.     On or about October 15th, 2014, the Anne Arundel County Fire Marshal conducted a spot annual but routine investigation, using his delegated authority from the Centers for Medicare and Medicaid Services.

87.     During this investigation, the Fire Marshal cited SSC Glen Burnie for seven deficiencies.  The facility was cited for storing objects too high, for inappropriate electrical wiring (a design defect), for failing to provide adequate services for fire systems and for the failure to have installed an automatic shutoff in the stove located in the rehabilitation gym.

88.     The fire marshal grouped these 17 deficiencies into 7 "tags."

89.     When Mr. Vain learned of these citations, he demanded of Mr. Boettcher that he personally call the Fire Marshal in order to get the citations reduced or eliminated.

90.     In response, Mr. Boettcher replied with the facts -- that the Fire Marshal had no discretion to eliminate citations that were not actually corrected in the presence of the Fire Marshall and that a simple request to eliminate these violations would do nothing to move the Fire Marshall --, and in protesting strenuously, he informed Mr. Vain that what was being asked of him would not only be ineffective but highly improper.

91.     As Mr. Boettcher continued to protest about this unacceptable procedure to Mr. Vain, Mr. Vain dug in his heels, insisting of Mr. Boettcher that he not only make the call, but also ensure it was successful; threatening Mr. Boettcher not only that it "would be in [his] best interest" to convince the Fire Marshal to drop the citations, but that his job depended on it.

92.     What was clear from this discussion was that Mr. Vain saw Mr. Boettcher as expendable, and an instrumentality to effectuate a result he himself would not venture to do.  He expected Mr. Boettcher to seek to bribe the Fire Marshal.

93.     Of course, the Fire Marshal is a quintessential public official whose duties are to the public welfare.

94.     The Maryland Code sets forth the duties of the Fire Marshall and his designees in part in  Md. Public Safety Code title 6 (state fire prevention commission and state fire marshal) Subtitle 3.

95.     The Fire Marshall conducts fire code enforcement, inspections and investigations, in order to ensure compliance with state and local fire laws, codes, rules, and regulations for the public benefit.

96.     The Fire Marshal's work includes supervising and participating in inspections of commercial and retail establishments, health care facilities, and new construction to ensure compliance with protective statutes, intended to maintain the safety of public buildings.

97.     In particular Md. Public Safety Code Ann. § 6-307 imposes upon the Fire Marshall or his designee a duty to inspect public buildings and § 6-305 provides for the general powers and duties of the critical functions of the State Fire Marshal.

98.

99.     Had Mr. Boettcher done what Mr. Vain asked of him, he would have violated common decency, but several Maryland criminal statutes; including, MD Code, Criminal Law, § 9-102 (concerning subornation of perjury), which prohibits a person from procuring another to commit perjury as prohibited by § 9-101 of the subtitle.

100.    Mr. Boettcher would have violated MD Code, Criminal Law, § 9-201 (concerning bribery of a public employee), which makes it unlawful to "bribe or attempt to bribe a public employee to influence the public employee in the performance of an official duty of the public employee."

101.    Mr. Boettcher may have also violated MD Code, Criminal Law, § 9-306 (concerning obstruction of justice which prohibits a person by "corrupt means" of obstructing, impeding, or try to obstruct or impede the administration of justice.

102.    But the more Mr. Boettcher resisted Mr. Vain's demands to call or meet with the Fire Marshal, the more Mr. Vain persisted, demanding repeatedly that Mr. Boettcher make the phone call in order to "persuade" the Fire Marshal to alter his findings.

103.    Indeed, when Mr. Boettcher, refused to make the phone call the first day, Mr. Vain reiterated his demand the next day.

104.    Eventually, on the threat of imminent termination, Mr. Boettcher relented, and called the Fire

Marshall; but to his credit, in the conversation that ensued, Mr. Boettcher merely asked the Fire

Marshall if he would rethink the citations, and inquired as to whether or not anything could be done to

reduce the number of citations.  The Fire Marshal advised Mr. Boettcher precisely what Mr. Boettcher

had told Mr. Vain -- he had no discretion to change the findings of his official investigation once the

violations were written up.

105.    Mr. Boettcher dutifully reported this uneventful discussion to the awaiting Mr. Vain, who

responded – not with stoic acceptance – but with anger, directed at Mr. Boettcher's refusal to "persuade"

the Fire Marshall.

106.    Admonishing Mr. Boettcher for his failure to "persuade" the Fire Marshall, Mr. Vain told Mr.

Boettcher that he was reporting his failure to Mr. Stratmeyer, who "will not be happy with this."

*The Acts of Termination.*—

107.    Over the course of the next two weeks, Mr. Vain grew increasingly impatient with Mr.,

Boettcher's remaining presence at the facility, and on the morning of October 29th, 2014, Mr. Vain

decided to escalate the intimidation tactics, this time to a physical confrontation.

108.    On that date, Mr. Vain forcibly entered Mr. Boettcher's office, and after flinging the door open,

shoved a large rolling cart at Mr. Boettcher, blocking the egress and ingress into the office.

109.    The cart bounced off the work bench, the desk and was stopped only by Mr. Boettcher's own

efforts in defense.

110.    When Mr. Boettcher was able to clear the cart from the obstructed door, which took about ten

minutes with assistance from a co-worker, Mr. Boettcher gathered his wits and courage, and decided to

approach Mr. Vain in his office.

111. But when Mr. Boettcher inquired of Mr. Vain what had caused his angry outburst, Mr. Vain reacted with a loud stream of profanities, exclaiming "How dare you question me, I can do whatever I fucking please." That reference was clearly directed to Mr. Boettcher's disagreement over the propriety of calling the Fire Marshall, and his refusal to engage in bribery.

112. On November 7th, Mr. Stratmeyer appeared at the facility, ostensibly to speak with Mr. Boettcher about the incident. However, when Mr. Boettcher copiously recounted the story to Mr. Stratmeyer, Mr. Stratmeyer demurred, and rather than admonishing Mr. Vain for the assault with the cart cavalierly stated that it "takes a strong hand to be the Administrator."

113. Failing to get justice or even a wisp of attention for Mr. Vain's tirade and the assault made upon him, on the 10th of November, Mr. Boettcher filed yet another Complaint with the corporate compliance line, and on November 11th, Mr. Boettcher filed criminal assault charges against Mr. Vain with the County.

114. Over the next few days, Mr. Boettcher took medical leave and sought medical assistance, visibly distraught over the events of the last few days and weeks.

115. Shortly after Mr. Boettcher returned, SavaSeniorCare's Human Resource representative Stephanie Jones (Vice President for Human Resources) interviewed parties involved in the assault.

116. On November 23rd of 2014, Ms. Jones accompanied by a Ms. Koros, who functioned as the Area HR Manager, returned ostensibly to provide the results of the investigation.

117. Mr. Boettcher, who had complied with the Handbook and the Code of Conduct in filing the Complaint, expected justice.

118. Instead, on that date, Ms. Jones terminated Mr. Boettcher.

119. Astonishingly, when the incredulous Mr. Boettcher asked why he was being terminated, Mrs.

Jones and Koros volunteered that Mr. Boettcher's termination was a result of complaints filed against the SSC Glen Burnie Administrator, Mr. Vain, and his superior, the RVPO, Mr. Stratmeyer.

120.   In other words, Mrs. Jones and Koros expressly admitted that Mr. Boettcher's termination was an act of retaliation for availing himself of the open door policy to complain against harassment.

121.   During that meeting Mrs. Jones (whose job it was to investigate Mr. Boettcher's Complaint) offered Mr. Boettcher her opinion to: she explained that, in her view, Mr. Boettcher's termination was simply a "win-win" solution for all parties.

***122.***   Mr. Boettcher's termination on November 23, 2014 resulted from his attempt to avail himself of the open door process for Complaints (including when wrongly accused of malfeasance and physical assaulted), and his steadfast refusal to unlawfully influence a public official.

***Events Following Termination.—***

123.   After being terminated, Mr. Boettcher sought to evoke the protection SavaSeniorCare promised him in the Sava Senior Care employment manuals and Code of Conduct.

124.   In particular, Mr. Boettcher sought to avail himself of the employee dispute resolution (EDR) processes as set forth in these governing employment manuals.

125.   As Mr. Boettcher stated in his letter: "In summary, please consider this letter … as a Grievance that should trigger the internal processes of SSC for resolution of such critical disputes."

126.   However, once again, Mr. Boettcher's attempt to trigger the due processes promised to him by SavaSeniorCare was honored by SavaSeniorCare in the breach rather than the observance.

127.   Upon outlining his grievance, neither SSC Glen Burnie nor SavaSeniorCare would afford Mr. Boettcher the formal hearing processes due under company policy, by conducting the necessary internal investigations, or by participating in facilitation and mediation under the policies.

128.     Furthermore, upon information and belief as before, neither SavaSeniorCare nor SSC Glen

Burnie took action against Messrs. Calvin Vain or Mr. Stratmeyer, choosing to ignore their own policies

for dispute resolution as set forth in the Employment Handbook and Code of Conduct, even though

Messrs. Stratmeyer and Vain's actions strongly suggested retaliatory and wrongful discharge, and by the

admission of the human resource personnel, was plainly and simply, in retaliation for the Complaints

that Mr. Boettcher justifiably filed.

III.     <strong>THE COUNTS</strong>

**Count I (Against SSC Glen Burnie and SavaSeniorCare):  Abusive Discharge – Violation of Public Policy**

127.     Mr. Boettcher realleges and incorporates by reference the above allegations.

128.     Defendants' termination of Mr. Boettcher on November 25, 2014 was a wrongful discharge that

violated several clear mandates of public policy.

247.     Federal and/or state public policy militates against employers inducing employees to perform

illegal acts that constitute bribery under threat of termination, violating the FLSA and Article 3 of

Maryland Labor and Employment Code, and committing assault at the workplace.

248.     Federal and/or state public policy militates against firing  employees (a) who refuse to perform

illegal acts that undermine public safety, (b) after holding them responsible for reporting violations

within the workforce, (c) who complain of violations of (i) the FLSA and (ii) Article 3 of Maryland

Labor and Employment Code, and (d) who report assault at the workplace.

249.

129.     Mr. Boettcher took actions that were in furtherance of these public policies; by among other

things, refusing to bribe a public official, filing claims against his employer for harassment, complaining

20

about violations of overtime and filing a criminal complaint in Maryland for what may have constituted second degree assault.

130.    SSC Glen Burnie and SavaSeniorCare were aware of the actions Mr. Boettcher took in furtherance of these public policies.

131.    In fact, SSC Glen Burnie and SavaSeniorCare terminated Mr. Boettcher in retaliation for the actions he took in furtherance of these public policies.

***Retaliation for Refusal to Perform an Illegal Act: Bribe the Fire Marshall.--***

132.    In particular, Mr. Boettcher was fired because of and immediately after he refused to perform an illegal act: to use undue influence or to bribe the Anne Arundel County Fire Marshal to reduce or eliminate health and safety violations cited against the SSC Glen Burnie.

133.    As precisely set forth in the paragraphs above, Mr. Vain's unrelenting campaign of harassment extended to asking Mr. Boettcher to perform an unlawful act, using his position to urge Mr. Boettcher to make a corrupt payment or pay a private price for official action.

134.    On October 15th, 2014, after the Anne Arundel County Fire Marshal cited SSC Glen Burnie for safety and health violations in connection with a spot inspection, Mr. Vain demanded Mr. Boettcher call the Fire Marshal in order to "persuade" the Fire Marshall to reduce or eliminate the infractions.

135.    Although Mr. Boettcher made it clear how highly improper such a request would be, how the Fire Marshal lacked legal discretion to eliminate citations in the normal course, and why a simple request to reconsider these violations would do nothing to move the Fire Marshall, Mr. Vain demanded that Mr. Boettcher convince the Fire Marshall otherwise, telling Mr. Boettcher not only that it "would be in [his] best interest" to persuade the Fire Marshal to drop the citations, but that his job depended on it.

136.    Of course, the Fire Marshal is a quintessential public official whose duties are to safeguard

public welfare, and the state has an obvious, vested and critical public policy interest in ensuring the

integrity and fairness of the Fire Marshal's inspections.

137.    This is  evidenced most obviously by the very laws that make it  unlawful to do what Mr. Vain

wished Mr. Boettcher to do: to bribe or attempt to bribe a public employee in the performance of his or

her official duties.

138.    When doing so, Mr. Vain as Mr. Boettcher's manager should have known, as Mr. Boettcher

knew, that such an act would contravene Maryland law and public policy, as expressed in several

provisions of the Criminal Article, including MD Code, Criminal Law, §§ 9-101 and 102, § 9-201

(which proscribes a "bribe or attempt to bribe a public employee to influence the public employee in the

performance of an official duty of the public employee" and potentially § 9-306.

139.    When it became clear Mr. Boettcher refused to cross the line and bribe the Fire Marshal, SSC

Glen Burnie and SavaSeniorCare sought to punish him with the ultimate sanction, termination.

140.    In firing Mr. Boettcher for failing to do Mr. Vain's bidding to "persuade" the Fire Marshal to

drop citations the Fire Marshal found after a careful and thorough visual inspection of the premises

when Mr. Vain knew he would be held accountable, SSC Glen Burnie and SavaSeniorCare effected an

abusive and wrongful discharge.

141.    As Mr. Vain knew, "persuade" was a code word for "bribe."

142.    As a result of discharging Mr. Boettcher for this and other retaliatory reasons, Mr. Boettcher

suffered monetary damages in the form of lost wages measured from the period of his termination to his

reemployment, monetary damages from stemming from the reduction of his salary at his new positon of

employment, monetary damages equivalent to the present discounted value of reduced fringe benefits,

the monetized value of foregone sick day benefits, monetary loss from the disparagement of his

reputation and status in the community and damages from emotional distress.

***Retaliation for Mandatory Reporting of Harassment as a Public Policy Violation.—***

143.    The 'Employee Handbook', which incorporates provisions of the separate Code of Conduct

booklet, specifically imposes upon employees of SSC Glen Burnie and SavaSeniorCare various

standards of conduct and business ethics, including those related to employee relations and harassment.

Moreover, the Employee Handbook and/or the Code of Conduct imposes upon the Employer and

employee alike mandatory processes, remedies and sanctions for violating these standards.

144.    Through the Employee Handbook's "Policy Prohibiting Harassment," in effect at all times

material hereto, the Employer promised to provide all employees with a work environment free of

harassment.

145.    Through its Employee Handbook, the Employer defined "harassment" broadly as actions that

demean the dignity of an employee through insulting or degrading remarks or conduct or which create

an intimidating, hostile or offensive work environment.

146.    The Employee Handbook and/or Code of Conduct prohibits retaliation, which it considers to be a

form of harassment.  Prohibited forms of harassment include physical retaliation and assault as well as

the termination of an employee for exercising the open door policy.

147.    Included under the rubric of "harassment" within the Employee Handbook and/or Code of

Conduct is "verbal conduct such as threats," physical conduct such as assault, retaliation for making or

threatening to make a harassment report or participating in an investigation regarding harassment.

148.    The Employee Handbook "strictly prohibit[s]" retaliation when an employee utilizing the

complaint process, reports harassment or participates in a government or company investigation.

149.    The Code of Conduct not only proscribes harassing behavior on behalf of management, but imposes on employees a duty to report such behavior when they have been the subject of such actions.

150.    In fact, the Code of Conduct mandates that it is the "responsibility of all employees to comply with the Code of Conduct … [and] to bring violations of suspected violations of the Code of Conduct or the underlying policies and procedures of which they are aware, to the attention of their supervisor or other management personnel…."

151.    Indeed, the Code of Conduct provides in mandatory terms that an employee who believes that he/she has been subject to any form of harassment must report the incident immediately to their supervisor, and further provides that if "reporting the incident to the supervisor makes the employee uncomfortable (or the Supervisor is the offending party) the incident must be reported to the next level of management, or to appropriate Region or Field Support Human Resources management personnel.

152.    The failure to comply with the Code of Conduct – and therefore the failure to report such harassment -- subjects employees to termination for cause.

153.    In essence, therefore, employees under the Employee Handbook and Code of Conduct are required to report actions which demean the dignity of an employee through insulting or degrading remarks or conduct, or which create an intimidating, hostile or offensive work environment.

154.    Again, if they the employees do not report such actions, they will be discharged, since the reporting of such actions to the Employer is elevated by the Handbook and the Code to an ineluctable duty.

155.    Mr. Boettcher performed his mandatory duty under the Handbook and Code when he filed Complaints against Messrs. Vain and Stratmeyer, first for wrongfully holding him responsible for actions outside of his control, second for Mr. Vain's physical assault against him, and finally, for the

Employer's refusal to pay overtime as mandated by Maryland and federal law.

156.     Once having reported such harassment or having availed himself of the complaint mechanism, Mr. Boettcher was supposed to be protected against retaliation by the Employer; including retaliation through termination of the employee, through physical retaliation or through other means.

157.     When Defendants imposed upon employees a duty to report serious potential breaches of law and policy within the company, they did so for self-serving means -- to prevent wider exposure of these possible improprieties so that they could be addressed within the company.

158.     The wrongful discharge, abusive discharge, or retaliatory discharge of Mr. Boettcher's firing resulted from his adherence to his duties under the Employee Handbook and the Code of Conduct, indeed from his very refusal to violate the sanctionable obligations imposed upon him by the Employee Handbook and the Code of Conduct.

*Retaliation for Complaining of the Failure to Pay Overtime.*—

159.     Just before his termination, Mr. Boettcher complained to Ms. Jones about the failure of the Employer to pay overtime for work he performed over 40 hours in a workweek.

160.     The Employer knew it was obligated to pay Mr. Boettcher overtime.

161.     The Employer encouraged Mr. Boettcher to work overtime.

162.     The Employer know Mr. Boettcher was working overtime.

163.     The Employer knew of their duties to pay Mr. Boettcher overtime.

164.     The Employer knew of its duty to maintain and report accurate time records, and it new it violated this duty when it instructed Mr. Boettcher to falsify records to show that he had worked only 40 hours per pay period.

165.    The Employer discharged Mr. Boettcher when he complained to his Employer that he was deserved of overtime, and when they anticipated his filing a formal governmental complaint.

166.    Mr. Boettcher was terminated when he acted as a whistleblower by disclosing to his Employer and eventually to the U.S. Department of Labor these potential abuses of law.

***Retaliation for Filing a Criminal Complaint.—***

167.    Under Md. Criminal Law Code § 3-203 and other provisions of the Maryland Code (Title 3. Other Crimes against the Person; Subtitle 2.  Assault, Reckless Endangerment, and Related Crimes) a person may not commit an "assault."

168.    An "assault" is defined broadly in Maryland to be an attempt to commit battery, and conduct tending to cause a reasonable apprehension of immediate bodily harm.

169.    When Mr. Vain threw the cart at Mr. Boettcher in or about October, 2014, he committed an assault by attempting to commit a battery, and by placing Mr. Boettcher in reasonable apprehension of immediate bodily harm.

170.    More particularly, Mr. Vain committed an assault by creating the apprehension in Mr. Boettcher that he was about to apply force to him.

171.    When Mr. Vain threw the cart at Mr. Boettcher, it was apparent he intended to inflict a battery and had the ability to carry out such intention.

172.    Mr. Boettcher filed a criminal complaint against Mr. Vain, and in addition, lodged a complaint with his Employer.

173.    In response and as a result thereof, Mr. Boettcher's Employer terminated him.

    **WHEREFORE,** Mr. Boettcher prays for the following relief:

A.      All available actual damages, compensatory damages, and punitive damages, including damages

for lost wages and the costs of the various fringe benefits;

B.      Damages for loss of reputation and status in the community.

C.      Damages for emotional distress.

D.      An award of prejudgment interest (to the extent not interfering with liquidated damages);

E.      Costs and attorneys' fees, to the extent allowed by law; and

F.      Such further relief as the Court deems equitable and just.

**Count II (Against SSC Glen Burnie and SavaSeniorCare).  Breach of Express and Implied Agreement, Breach of the Employee Policy Manual and Promissory Estoppel**

175.    Mr. Boettcher realleges and incorporates by reference the above allegations.

176.    The Employer's assertions during the interview phase, by the course of dealing, and by the

procedures, requirements and duties set forth in their Employee Handbook and Code of Conduct, formed

and established an express or implied-in-fact employment contract that between Mr. Boettcher and his

Employer and co-employees, such as Mr. Vain.

177.    The Employment Handbook declares that it summarizes "current Company programs, policies

and procedures … as guidelines for employees," but that its contents do not constitute "terms and

conditions of a contract of employment."   As is customary, the Handbook declares that the Company

may terminate the employment relationships for any reason and at any time.

178.    The Employee Handbook further states that "any statement to the contrary is invalid and should

not be relied upon by any prospective or existing employee."

179.    Of course, the Employer's statement it may terminate the employment relationship for any

reason and at any time is not just overboard, it is false and misleading, since the company is prohibited

from terminating employees under any number of statutory regimes that prohibit retaliation, including

the many Federal laws governing employment discrimination (the Equal Pay Act, other provisions of the

FLSA, Title VII of the Civil Rights Act of 1964 (including the Pregnancy Discrimination Act), the

Family and Medical Leave Act, the Age Discrimination in Employment Act (ADEA), the Rehabilitation

Act of 1973 the Bankruptcy Reform Act of 1978, the Immigration Reform and Control Act of 1986, the

Americans with Disabilities Act of 1990 (ADA), the Genetic Information Nondiscrimination Act of

2008).

180.    At the same time, the Employer disavows the contractual nature of the Employee Handbook, the

Employer seeks to impress upon the employees that it carries the imprimatur of a legally enforceable

contract, stating "Your signature on the final page to this handbook documents your agreement to abide

by the policies of the Company … [and] your acknowledgement that you will not be suspended,

terminated or discriminated against for reporting abuse and neglect."

181.    Hence, by requiring the employee to "agree" to be bound by the policies then in effect, and by

making its own assurances against retaliation, the Employer made promises to employees as to

mandatory duties, actions and prohibited conduct, on which employees were supposed to act.

182.    The Employee Handbook and the Code of Conduct, and the Employee Dispute Resolution

Booklets in effect at all relevant times hereto, are much more than a collection of general and

unenforceable employment policies: the Employee Manual painstakingly described a plethora of job

benefits, rights, procedures, and protections, together with a description of binding responsibilities and

duties.

183.    Indeed, the Employee Handbook used the mandatory term "must" on 24 occasions, held the

employee "responsible" on 5 occasions, used the terms "shall" "will",  "require" "or is prohibited" on no

fewer than 17 occasions to define the numerous duties and procedures to which Mr. Boettcher (and he expected his co-employees) would be held accountable and responsible.

184.    All of this bolstered Mr. Boettcher's expectation of his rights and obligations under that Employee Handbook, not only vis-à-vis his Employer but the Employer's managers and his co-employees.

185.    Mr. Boettcher justifiably relied on the duties, rights and procedures contained in that Employee Handbook when he "agree[d] to abide by the policies of the Company."

186.    Mr. Boettcher justifiably relied on the duties, rights and procedures contained in that Employee Handbook that forbid "physical conduct, such as assault … or blocking normal movement."

187.    Mr. Boettcher justifiably relied on the duties, rights and procedures contained in that Employee Handbook when he adhered to the Code of Conduct concerning reporting of harassment.

188.    Mr. Boettcher justifiably relied on the duties, rights and procedures contained in that Employee Handbook when he relied on the Employer's assertions and promises that they would not retaliate against him "for making or threatening to make harassment reports to the Company, or for participating in an investigation into harassment allegations."

189.    Mr. Boettcher justifiably relied on the duties, rights and procedures contained in that Employee Handbook when he relied upon the assertions of the Employer that they "strictly prohibit[]" themselves from "retaliation against an individual when they use the complaint process and/or participate in any manner in  an investigation … by the Company or a government agency."

190.    Mr. Boettcher justifiably relied on the duties, rights and procedures contained in that Employee Handbook when he relied upon the promises of the Employer that Category III violations would lead to termination of the offending employee, rather than retribution to the reporting employee.

191.    Category III violations that the Employer promised would lead to immediate termination included the "physical[], verbal[], emotional[] or psychological[] abuse … [of ] another employee," "fight[ing], hit[ting], shov[ing], push[ing], forcibly grab[ing], offensively touch[ing], threaten[ing], … or engag[ing] in disorderly conduct," of the violation of the "company's unlawful harassment policies" and the "Code of Conduct."

192.    Mr. Boettcher justifiably relied on the duties, rights and procedures contained in that Employee Handbook when he sought to use the Company's Employment Dispute Resolution process for resolving work concerns.

193.    Mr. Boettcher relied on the Employer's assertions in their Employee Handbook to the effect that the Employer would discharge offending employees rather than seek retribution against the complainant when he reported harassment on May 23rd, 2014.

194.    Mr. Boettcher relied on the Employee Handbook's protections that the Employer would discharge recalcitrant employees rather than seek retribution against the complainant, when he reported the physical assault against him in November of 2014, with both the compliance hotline and Mr. Stratmeyer.

195.    In creating and distributing the Employee Handbook and in enumerating the voluminous lists of duties and protections therein, Defendants chose to create an environment in which Mr. Boettcher and other employees believed that they were mutually protected by its provisions.

196.    The Employee Handbook was intended to and did recount a statement of the terms of the contract of Mr. Boettcher's employment, and was clearly intended to be a document that employees could regard as a binding, legally enforceable commitment concerning the terms and procedures and duties and requirements of employment.

197.    In fact the Employee Handbook implied limitations or embellishment on at-will status by listing the reasons employees of Defendants would be terminated.  The mandatory terms of the Employee Handbook created an atmosphere where Defendants' employees justifiably relied on the expressed policies, and justifiably expected that Defendants would do the same, especially with respect to disciplinary procedures, grievance procedures, termination procedures and protections against offending employees.  As such the Employee Handbook imposes enforceable contract limitations which cannot be swept away.

198.    As a consequence, Defendants ought to be denied the ability to decry the promises they made under principles of Promissory Estoppel.

199.    Defendants breached their express and implied agreement with Mr. Boettcher in many ways: by failing to discipline or suspend fellow employees, such as Messrs. Vain and Stratmeyer, whose actions so egregiously violated the Code of Conduct and Employee Handbook they were expected to lead to immediately termination (i.e., by failing to take appropriate disciplinary action against management employees that violated these policies), by requiring Mr. Boettcher to report harassment and then purposely retaliating against him for doing so; by requiring Mr. Boettcher to cooperate with government investigations, and then not only directing that he try to unduly influence the result of those investigations but terminating him for failing to do so; by failing to prevent conduct that constituted harassment or interfered with another employee's performance, by creating a hostile or intimating and offensive work enforcement, by failing to consider grievances by failing to adhere to the numerous proscriptions against retaliation.

200.    Defendants' breach of this implied and express contract -- created through the Offer of Employment, the Employee Handbook and through the principles of Promissory Estoppel -- caused

significant and material economic and non-economic damage to Mr. Boettcher, including the loss of the wages to which he was entitled, and the loss of her dignity.

201.    These breaches were purposeful, willful, malicious an intended to do hard to Mr. Boettcher and designed to be a one-way street to protect management from its own violations of public policy.

**WHEREFORE,** Mr. Boettcher prays for the following relief:

A.    All available actual damages, compensatory damages, and punitive damages, including damages for lost wages and the costs of the various fringe benefits;

B.    Damages for loss of reputation and status in the community.

C.    Damages for emotional distress.

D.    An award of prejudgment interest (to the extent not interfering with liquidated damages);

E.    Costs and attorneys' fees, to the extent allowed by law; and

F.    Such further relief as the Court deems equitable and just.

**Count III (Against Defendants SavaSeniorCare and SSC Glen Burnie):  Violations of the Overtime Requirements of the FLSA**

202.    Mr. Boettcher realleges and incorporates by reference all of the above allegations.

203.    SavaSeniorCare and SSC Glen Burnie at all times relevant hereto were joint employers of Mr. Boettcher under the FLSA.

204.    Both entities had and exercised the power to hire and fire Mr. Boettcher: Mr. Boettcher was hired by an earlier RVPO of SavaSeniorCare, reported to the Administrator of SSC Glen Burnie, and was fired jointly by the SSC Administrator and the SavaSeniorCare RVPO.

205.    Both SSC Glen Burnie and SavaSeniorCare supervised and controlled Mr. Boettcher's work schedule, his priorities, the scope and conditions of his employment.

206.     Both entities determined the rate at which, the method by which and the frequency with which Mr. Boettcher was to have been paid.

207.     Under the statutory requirements of both federal and Maryland law (Count IV), non-exempt employees are to be paid overtime for a workweek in excess of 40 hours, where each workweek stands alone in determining whether or not, and if so, to the extent to which, the regular 40 hour workweek has been exceeded (See, 29 C.F.R. §778.104).

208.     The FLSA mandates that when the 40 hour workweek has been exceeded employers must pay employees weekly overtime premium pay of one and one-half times the employee's regular rate of pay for all hours worked beyond that 40 hour week. (See, 29 U.S.C. § 201; 29 U.S.C. § 206).

209.     The FLSA then authorizes employees to initiate private actions to recover the gap between their actual pay and the required minimum or overtime wages for their hours worked, and permits them to recover not only that gap in pay, but an equivalent amount of liquidated damages and attorneys' fees and costs (See, 29 U.S.C. 216(b)).

210.     From the date Mr. Boettcher was first hired into the SSC Glen Burnie facility on December 10th, 2010 until his termination on November 25, 2014 – a period of slightly less than 4 years -- Mr. Boettcher's primary function never changed: it was to perform manual maintenance services.

211.     Mr. Boettcher performed these manual services for the SSC Glen Burnie facility under the title of "Maintenance Supervisor until July 2013, when his title was altered to "Maintenance Director" under the direction of Phillip Polokavich.

212.     This change in title did not increase Mr. Boettcher's actual managerial function or duties; indeed, as set forth supra, after this title change, in an effort to induce and then document performance flaws as a pretext for his terminations, Mr. Vain actually sought to reduce whatever limited discretion Mr.

Boettcher enjoyed by micromanaging those items he was to repair and those projects he was to work on, and by dictating the sequence of events and the timing of completion.

213.    On a day-to-day basis, throughout the period of his employment, Mr. Boettcher's job consisted of effecting repairs for the upkeep of all buildings, equipment and grounds.

214.    Mr. Boettcher was also responsible for adherence to all Life Safety Code and Federal health guidelines.

215.    In effecting these repairs and performing these perfunctory duties, the priority and direction of efforts were mandated by superiors.

216.    In performance of these functions, Mr. Boettcher was required to be on duty 24 hours a day, each day of every week.

217.    During the period between December 10th, 2010 through June of 2011, Mr. Boettcher was paid a "regular rate" of $35 per hour, inclusive of paid leave of $35 per hour.

218.    During the period between from June of 2011 until November 25, 2014, Mr. Boettcher was paid a "regular rate" of $34.19 per hour, inclusive of paid leave of $34.19 per hour.

219.    During the time period of his employment, given the mercurial duties of his role, Mr. Boettcher was frequently required to work weeks in excess of 40 hours, sometimes putting in twelve hour days, all in an attempt to get the job done.

220.    The average workweek Mr. Boettcher put in was about 60 hours.

221.    Throughout the vast majority of this employment with SSC Glen Burnie and SavaSeniorCare, however, Mr. Boettcher was not paid for overtime.

222.    In fact, only during the pay period between the end of June 2014 and the beginning of July 2014 did the Employer pay Mr. Boettcher any compensation whatsoever for work that he performed after 40

hours in any given week, and only then at a rate of $6.00 per hour for emergency services, one-fifth of his regular rate.

223.    Throughout the period of his employment, the Employer not only had constructive knowledge of Mr. Boettcher's overtime workload but actual knowledge of that workload.

224.    Furthermore, neither SSC Glen Burnie nor SavaSeniorCare was confused about the legal requirement to pay Mr. Boettcher overtime.

225.    Either SSC Glen Burnie, SavaSeniorCare or both knowingly, purposefully, willfully egregiously refused to honor their legal requirements under the FLSA.

226.    The Employer's requirement to pay overtime was obvious and known to the Employer.  Over the course of Mr. Boettcher's employment with SavaSeniorCare and SSC Glen Burnie, Mr. Boettcher was alternately treated as a exempt and non-exempt employee, although the company knew his duties remained relative the same over the course of his employment.

227.    And with an effort to achieve plausible deniability, the Employer violated the overtime requirements of the FLSA by among other ways, egregiously requiring employees to falsify records that reflected no overtime.

228.    Defendants' violation of the FLSA were "willful" because SSC Glen Burnie's and SavaSeniorCare's leadership either knew or showed reckless disregard for whether their conduct was prohibited by statute.

229.    More particularly, in one period, from December 10th, 2010 until the second week of July 2013, the Employer categorized Mr. Boettcher as a "non-exempt" worker.

230.    During this time frame, Mr. Boettcher was required to dutifully report hours; however, he was instructed not to report more than 40 hours, even though his Employer knew, and as a result of the fact that his Employer knew, he was working more than 40 hours per week.

231.    In fact, Mr. Boettcher's time sheets only reflected, and he was instructed to ensure they reflected, only the number of hours worked each day from the beginning of the pay period (which began on Thursday) until such hours reached 40 hours.

232.    As he approached the 40 hour mandatory limited prescribed by the Employer, Mr. Boettcher was instructed to alter the records so that they reflected a maximum of forty hours at the end of the pay period.

233.    Hence, the hours Mr. Boettcher actually reported were, known to the Employer, to be significantly less than the hours actually worked.

234.    In some cases, per the instructions and expectations of his Employer, the hours Mr. Boettcher recorded he worked on Tuesday and Wednesday, the two last days of the pay period, would reflect that he worked only 1 or 2 hours, or reflect improperly that he had a day off.

235.    In some cases, Mr. Boettcher, known to the Employer, was instructed to apply hours worked in one week to another week arbitrarily and without regard to the hours actually worked, in order to disguise the fact they required him to work overtime.

236.    In short, the Employer required Mr. Boettcher to submit false pay records in violation of the FLSA, knowing of, and in order to escape their clear obligations under this law.

237.    Upon the arrival of Mr. Stratmeyer's hand-picked successor for Administrator of the SSC Glen Burnie facility, the company policy against paying required overtime did not change, but the tactics to violate the strictures of the FLSA did.

238.    After Mr. Vain became the Administrator of the SSC Glen Burnie facility rather than requiring Mr. Boettcher to simply falsify time sheets to untruthfully reflect he worked fewer hours than they did, the Employer established a policy of falsely indicating that the employees were exempt, when they were not exempt.

239.    In performing his ministerial functions to maintain the facilities and its equipment, Mr. Boettcher was not an "administrative employee": he neither performed work that was "directly related to the management or general business operations" of the Employer under 29 C.F.R. section 541.200, nor "exercised discretion and independent judgment with respect to matters of significance."

240.    Mr. Boettcher was also not an exempt "executive" within the meaning of the FLSA.

241.    Even though the company called him a "Supervisor" or "Director," he was closely supervised, spent far less than 50 percent of his time performing managerial duties (mostly perfunctory in nature anyway), and whatever managerial duties he exercised were not more important that his non-managerial duties.

242.    Furthermore, Mr. Boettcher did not exercise discretionary power on a regular basis, and he had very limited authority to hire and fire.  (See, 29 U.S.C. section 213(a), 29 C.F.R. sections 541.1(f), 541.102 and 541.103).

243.    Mr. Boettcher's primary duty never included managing the enterprise, or even managing a customarily recognized department or subdivision of the enterprise.

244.    In addition, as noted, whatever discretion Mr. Boettcher might have had in the past or through his title was constricted in practice by Mr. Vain, who intentionally directed Mr. Boettcher to perform duties on a paint-by-number format Mr. Vain dictated.

245.    This action damaged Mr. Boettcher by withholding from him wages and overtime earned.

246.    Apart from discharging Mr. Boettcher in retaliation for his complaints filed pursuant to the

Employment Handbook and Code of Conduct, and wrongfully discharging Mr. Boettcher when he

refused to use undue influence with a public official, the Employer discharged Mr. Boettcher when he

raised his rights to enforce the FLSA requirements pertaining to overtime, and his eligibility for payment

under these provisions.

247.    In fact, just a few days prior to his dismissal, Mr. Boettcher raised the issue of overtime with Ms.

Stefanie Jones.

248.    In January of 2015, Mr. Boettcher ultimately reported the violations of the FLSA to the U.S.

Department of Labor, Wage and hour Division, requesting that they examine whether or not she is

entitled to overtime as a non-exempt employee.

**WHEREFORE,** Mr. Boettcher prays for the following relief:

A.    A Declaratory Judgment against Defendants that their violations of the FLSA were willful.

B.    Judgment against Defendants in an amount equal to Mr. Boettcher's unpaid back wages,

including the agreed upon hourly rate and minimum and overtime rates;

C.    An amount equal to unpaid back wages as liquidated damages pursuant to the FLSA

D.    An award of prejudgment interest (to the extent liquidated damages are not awarded);

E.    A penalty assessed against Defendant for each violation of the law and for each violation of the

accurate record keeping requirements of the law;

F.    All legal and equitable relief available under the FLSA;

G.    All available actual damages, compensatory damages, and punitive damages;

H.    Costs and attorneys' fees, to the extent allowed by law; and

I.    Such further relief as the Court deems equitable and just.

**Count IV (Against Defendants SavaSeniorCare and SSC Glen Burnie):  Violations of the Wage and Hour and Recordkeeping Requirements under Maryland Law**

250.    Mr. Boettcher realleges and incorporates by reference the above allegations.

251.    Maryland Labor and Employment Code § 3-415  provides that unless excepted "each employer shall pay an overtime wage of at least 1.5 times the usual hourly wage, computed in accordance with § 3-420 of [the] subtitle."

252.    Maryland Labor and Employment Code § 3-420 provides that SSC Glen Burnie and SavaSeniorCare were to compute Mr. Boettcher's wage for overtime under § 3-415 of the subtitle on the basis of each hour over 40 hours that an employee works during 1 workweek.

253.    Maryland Labor and Employment Code § 3-415  neither  excepts health care facilities such like SSC Glen Burnie or for SavaSeniorCare or Mr. Boettcher's occupation from the strictures of this law.

254.    In addition to those actions authorized under the FLSA, Maryland Labor and Employment Code § 3-507.2 authorizes an action against an employer for unpaid wages, and provides for an award not exceeding three times those wages as damages.

255.    Maryland Labor and Employment Code § 3-427 provides that, in the event an employer pays less than the wage required under the Labor and Employment Article of Maryland Law, Title 3 Employment Standards and conditions, Subtitle 4 Wages and Hours, the employee can bring an action to recover the difference between the wage paid and required, an additional amount equal to the difference between the wage paid to the employee and the wage required as liquidated damage and counsel fees and other costs.

256.     Maryland Labor and Employment Code § 3-508 additionally authorizes an action against an employer for unpaid wages, and provides for an award not exceeding three times those wages as damages.

257.    Also, like its federal statutory counterpart, Maryland Labor and Employment Code imposes upon employers certain records keeping requirements: employers are required to keep for three years records pertaining to the rate of pay of each employee, the amount that is paid each pay period, the hours that each employee works each day and workweek, and other information required by the State through regulation.

258.    Furthermore, Maryland Labor and Employment Code § 3-504 requires the employer to give to each employee at the time of hiring notice of the rate of pay, and for each pay period, a statement of the gross earnings of the employee and deductions from those gross earnings.

259.    Maryland Labor and Employment Code § 3-428 also prohibits an employer from taking adverse action against an employee, such as discharge of that employee or other retaliatory action, when an employee complaints – whether through the internal grievance process or otherwise – about not being paid the wages required under Maryland Law.

260.    The State of Maryland purposely enacted this law to meet a public policy objective as set forth in Maryland Labor and Employment Code § 3-402.

261.    Neither SSC Glen Burnie nor SavaSeniorCare in this action acted in good faith and reasonably believed that the wage paid to Mr. Boettcher were not less than the wages required by the Labor and Employment Article of Maryland Law, Title 3 Employment Standards and conditions, Subtitle 4 Wages and Hours.

262.    The employer's requirement to pay overtime under Maryland law where as obvious and known to both Defendants, who knowingly, purposefully, willfully and egregiously and with an effort to achieve plausible deniability, violated the overtime requirements of Maryland Law; including by

egregiously requiring Mr. Boettcher to falsify records so that they falsely reflected he had not worked overtime when in fact he was observed to have worked, he was directed to work overtime.

263.    Defendants' violations of Maryland law were "willful" because SSC Glen Burnie's and SavaSeniorCare's leadership either knew or showed reckless disregard for whether their conduct was prohibited by Maryland law.

264.    As a result of the violations of Maryland law set forth in the above paragraphs, Defendants are liable for unpaid wages, and an award not exceeding three times those wages as damages, an additional amount equal to the difference between the wage paid to the employee and the wage required as liquidated damage and counsel fees and other costs as set forth in Maryland Law.

265.     Defendants discharged Mr. Boettcher in retaliation for raising his rights to enforce the FLSA requirements pertaining to overtime in violation of Maryland Labor and Employment Code § 3-428 when he reported these violations to his superiors.

**WHEREFORE,** Mr. Boettcher prays for the following relief:

A.    A Declaratory Judgment that Defendants violations of the provision s of Maryland Law, Title 3 Employment Standards and Conditions, as set forth above, were willful.

B.    Judgment against Defendants in an amount equal to Mr. Boettcher's unpaid back wages as increased by the liquidated damages provisions of Maryland Labor and Employment Article as set forth in §§ 3-427 and 3-508 thereto.

C.    An award of prejudgment interest (to the extent not interfering with liquidated damages);

D.    A penalty assessed against Defendant for each violation of the law and for each violation of the accurate record keeping requirements of the law;

E.    All legal and equitable relief available under the Maryland Labor and Employment Article;

F.      All available actual damages, compensatory damages, and punitive damages;

G.      Costs and attorneys' fees, to the extent allowed by the Maryland Labor and Employment Article; and

H.      Such further relief as the Court deems equitable and just.


## IV.      PRAYER FOR RELIEF

WHEREFORE, Mr. Boettcher prays for a judgment in his favor and against the Employer, and that the following relief be awarded to him:

As to Count I, relating to wrongful, abusive and retaliatory discharge, judgment in the amount of at least $500,000 for the compensatory damages, direct and indirect, that Mr. Boettcher has sustained, including those damages corresponding to lost wages and the diminishment of the value of various fringe benefits, damages he has sustained to his reputation and status in the community, and damages due to emotional distress, plus an additional amount of at least $250,000 for punitive and exemplary damages as a result of the wrongful discharge, plus an award of prejudgment interest costs and attorneys' fees to the extent allowed by law.

As to Count II, for breach of agreement, breach of the employee policy manual and promissory estoppel, judgment in the amount of at least $500,000 for the actual and compensatory damages he has sustained, directly and indirectly, including damages for lost wages and the value of the various fringe benefits  diminished in his new employment, for the damages he has sustained to his reputation and status in the community, and for damages due to emotional distress, plus an additional amount of at least $250,000 for punitive and exemplary

damages for the wrongful discharge, plus an award of prejudgment interest costs and attorneys' fees, to the extent allowed by law.

As to Count III, for violations of the FLSA, a declaratory judgment that such violations were willful, plus monetary damages an amount equal to Mr. Boettcher's unpaid back wages as determined by the court or jury at an evidentiary hearing, as the case may be, including the agreed-upon hourly rate and minimum and overtime rates, an amount equal to unpaid back wages as liquidated damages pursuant to the FLSA together with all legal and equitable relief available under the FLSA, together with an award of prejudgment interest (to the extent liquidated damages are not awarded) and such penalties assessed against Defendant(s) for each violation of the law and for each violation of the accurate record keeping requirements of the law as the Court deems equitable and just.

As to Count IV, Mr. Boettcher prays for a Declaratory Judgment that SavaSeniorCare and SSC Glen Burnie violated the provisions of Title 3 of Maryland Law, pertaining to Employment Standards and Conditions, and that such violations were willful.  Mr. Boettcher prays, pursuant to this Count, for monetary relief in the form of a judgment against Defendants in an amount equal to his unpaid back wages as increased by the liquidated damages provisions of Maryland Labor and Employment Article as set forth in §§ 3-427 and 3-508 thereto.  Mr. Boettcher further prays for a penalty assessed against Defendant for each violation of the law and for each violation of the accurate record keeping requirements of the law to which the Mr. Boettcher may be entitled, all legal and equitable relief available under the Maryland Labor and Employment Article and all available actual damages, compensatory damages, and punitive damages, in an amount as determined by the court or jury as the case may be at evidentiary hearing.

For all such Counts, Mr. Boettcher reiterates that he Prays for prejudgment interest and attorney fees as permitted by law and such other and further relief as the Court deems just and proper.

## IV.    DEMAND FOR TRIAL BY JURY

The Plaintiff by and through his attorney, hereby demands a trial by jury of all issues in this cause of action unless expressly waived.

Respectfully submitted,

/S/ DAN R. MASTROMARCO

Dated: December 3, 2015            DAN R. MASTROMARCO

Bar ID:  18243
Attorney for Plaintiff
THE MASTROMARCO FIRM, PLLP
(410) 349-1725
(410) 268-1597
ARGUSGROUPDRM@AOL.COM

**List of Exhibits to Complaint**

Exhibit 1:      Employee Policy Manual.

Exhibit 2:      The Code of Conduct.